**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **TRACY NEIL HAMBLEN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **No.  3:12-CV-2009-BH** |
| | ) | |
| **CAROLYN W. COLVIN, ACTING** | ) | |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the *Order Reassigning Case* dated September 11, 2012, this case has been transferred for all further proceedings and entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed September 24, 2012 (doc. 18), and *Defendant's Motion for Summary Judgment*, filed October 24, 2012 (doc. 20).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED in part,** Defendant's motion is **DENIED in part,** and the case is **REMANDED** to the Commissioner for further proceedings.

**I.  BACKGROUND[1]**

A.      **Procedural History**

Tracy Neil Hamblen (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act.  (R. at 1–4.)  On June 30, 2009, Plaintiff applied for SSI, alleging disability beginning May 30, 2009, due to affective mood disorder, hemorrhoids, and

---

[1]     The background information comes from the transcript of the administrative proceedings, which is designated as "R."

restless leg syndrome.  (R. at 70–72, 149–54.)  His application was denied initially and upon

reconsideration.  (R. at 70–71.)  He timely requested a hearing before an Administrative Law Judge

(ALJ), and he personally appeared and testified at a hearing held on January 4, 2011.  (R. at 23–69.)

On February 24, 2011, the ALJ issued her decision finding Plaintiff not disabled.  (R. at 10–18.)

The Appeals Council denied his request for review on May 10, 2012, making the ALJ's decision the

final decision of the Commissioner.  (R. at 1–4.)  He timely appealed the Commissioner's decision

pursuant to 42 U.S.C. § 405(g).  (doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on May 27, 1960, and was 50 years old at the time of the hearing before

the ALJ.  (R. at 28, 149.)  He graduated from high school and has past relevant work as a floral

arranger and salesman of floral supplies.  (R. at 35, 61–62.)

### 2.    Medical, Psychological, and Psychiatric Evidence[2]

On December 15, 2006, Plaintiff requested a refill for his Nexium prescription at Parkland

Hospital's East Dallas Health Clinic (EDHC).  (R. at 495.)  He told John Wilson, M.D., his treating

physician, that "he just recently started having some heartburn" but was "not having any trouble

swallowing."  (*Id.*)  He had a Schatzki's ring[3] that had been "dilated in the past."  (*Id.*)  He also

complained of paresthesias (i.e., tingling, tickling, pricking, or burning) in his feet, which worsened

at night, and explained that his feet felt "numb a lot of the time."  (*Id.*)  He felt "like something [was]

---

[2]  The resolution of this action involves Plaintiff's physical residual functional capacity.  Accordingly, only the medical evidence and the relevant psychological and psychiatric evidence is included in this summary.

[3]  This is a birth defect of the esophagus; it is "an abnormal ring of tissue that forms where the esophagus ... and the stomach meet," and the most common symptom "is the feeling that food ... is stuck in the lower neck or under the breastbone." U.S. National Library of Medicine National Institutes of Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001257/ (last visited September 12, 2013).

crawling around" on his feet and legs and he "ha[d] to get up and walk around" to lessen his discomfort.  (*Id.*)  Dr. Wilson's diagnoses were paresthesias, varicose veins, and Gastroesophageal Reflux Disease (GERD).  (*Id.*)

Plaintiff returned to EDHC on January 2, 2007, stating that he had "problems with his feet at night" that required him to "get up and walk around."  (R. at 246.)  Dr. Wilson diagnosed him with "restless leg syndrome" and prescribed him medication.  (*Id.*)  Four months later, Plaintiff returned because he "he ha[d] trouble with [his] medications" for his restless leg syndrome.  (R. at 248.)  Although the medications "ha[d] given him a fair amount of improvement," the relief was "not as much as he ... need[ed]."  (*Id.*)  He also requested a refill for Nexium.  (R. at 492.) Dr. Wilson continued his medications and referred him to a neurologist.  (R. at 248.)

On April 4, 2008, Bachin Estephen, M.D., Plaintiff's treating physician at Parkland, submitted a disability letter stating that Plaintiff suffered from essential tremors and small fiber sensory neuropathy.[4]  (R. at 245.)  Dr. Estephen opined that Plaintiff's essential tremor "might limit some of his activit[ies] of daily living related to fine motor movements and dexterity", and his neuropathy could cause swelling, chronic pain, and numbness.  (*Id.*)

On July 23, 2008, Plaintiff presented to EDMC, complaining of diarrhea.  (R. at 416.)  Dr. Wilson diagnosed him with high blood pressure and low sodium level.  (*Id.*)  Five days later, Plaintiff told Dr. Wilson that he had pain and numbness in his legs that was partially relieved by hydrocodone.  (R. at 423.)  He measured six feet and weighed 148.9 pounds.  (*Id.*)  Dr. Wilson's assessment was leg pain, restless leg syndrome, hyponatremia, and hypertension.  (*Id.*)  He

---

[4]  Small fiber sensory neuropathy "is a disorder in which only the small sensory cutaneous nerves are affected"; its symptoms "are primarily sensory in nature and include unusual sensations such as pins-and-needles, pricks, tingling, and numbness," and they "start in the feet and progress upwards."  John Hopkins Medicine, http://www.hopkinsmedicine.org/neurology_neurosurgery/specialty_areas/peripheral_nerve/conditions/small_fiber_sensory_neuropathy.html (last visited September 12, 2013).

prescribed Clonazepam for the restless leg syndrome and instructed him to follow up in four weeks. (*Id.*)

On June 17, 2008, Plaintiff saw Dr. Estephen for his "chronic neuropathic leg pain." (R. at 272–73.)  Neurontin "relieved his cramps," but he continued having burning pain that increased when standing. (R. at 272.)  He told Dr. Estephen that he was diagnosed with "essential tremors" in his hands at a "young age" and experienced numbness, tingling, and pain. (*Id.*)  Dr. Estephen diagnosed him with small fiber neuropathy and prescribed him medication. (R. at 273.)

Ten days later, Plaintiff saw Dr. Wilson for sinus headaches, dizziness, and flushing. (R. at 488.)  Dr. Wilson diagnosed him with hyponatremia, high blood pressure, sinusitis, and diarrhea. (R. at 489.)  A few weeks after that, Plaintiff reported weakness and numbness in all of his extremities. (R. at 486.)

By August 11, 2008, Plaintiff still had discomfort, numbness, and pain in his legs that he claimed increased at night. (R. at 429.)  He explained that he "ha[d] to move his feet to keep them comfortable." (*Id.*)  While the Clonazepam gave him some relief and helped him sleep, and the Lortab "help[ed] somewhat relieve the pain during the day," neither medication gave him complete relief. (*Id.*)  A few weeks later, Plaintiff was "feeling run down [and] tired." (R. at 435.)  He told Dr. Wilson that his leg pain was "worse" than ever and was not relieved by medication. (*Id.*)  Dr. Wilson diagnosed him with hyponatremia and hypertension, and prescribed him medication. (*Id.*)

Plaintiff presented to UT Southwestern Medical Center on August 29, 2008, to undergo a nerve motor conduct test. (R. at 232.)  His postganglionic sudomotor function and sympathetic vasomotor function were "normal," he had an "impairment in [the] cadiovagal modulation of [his] heart rate" "most likely related to medication," and his peripheral small fiber function (assessed by

QSART[5]) was "intact."  (R. at 235.)

On October 20, 2008, Plaintiff presented to EDHC, complaining of fever, swollen glands, sore throat, cough, and lethargy.  (R. at 440.)  Dr. Wilson found he was alert, cooperative, and in no acute distress during a physical examination.   (*Id.*)   The diagnoses were pharyngitis, leg pain, bipolar disorder, and hypertension.  (*Id.*)  Plaintiff's on-going "problem list" consisted of restless leg syndrome, essential hypertension (benign), bipolar disorder (unspecified), esophageal ulcer, dysphagia, hemorrhoids, and anal warts.  (R. at 439.)  Dr. Wilson prescribed him an antibiotic for his pharyngitis and ordered laboratory tests for his neurological symptoms.  (R. at 440–41.)  Plaintiff saw Dr. Wilson again the next month for his neuropathic pain and a burning sensation in his feet and lower shins.  (R. at 269.)  Dr. Wilson's diagnosis was "small fiber sensory neuropathy."  (R. at 270.)

During a consultation on January 26, 2009, Plaintiff's chief complaint was pharyngitis, and his symptoms were "worsened by swallowing."  (R. at 447.)  He told Dr. Wilson that he had a history of hemorrhoids and was experiencing "soiling of his under[wear] and bleeding" in his stool. (R. at 447–48.)  He also "for the first time [began] experiencing symptoms of acid reflux at night." (R. at 447.)  He had no itching, nausea, vomiting, abdominal pain, diarrhea, or constipation.  (R. at 448.)  Dr. Wilson found that he appeared "well-developed and well-nourished" during a physical examination, diagnosed him with GERD and pharyngitis, referred him for an upper endoscopy and colonoscopy, and instructed him to follow up in one month.  (R. at 448, 451.)  Plaintiff's medical history was noted as congenital tracheoesophageal fistula, esophageal atresia and stenosis, restless leg syndrome, essential hypertension (benign), bipolar disorder (unspecified), GERD, and

---

[5] Quantitative Sudomotor Axon Reflex Test (QSART) is used to diagnose, among other conditions, small fiber neuropathy when nerve conduction tests are normal.  *See* Center for Peripheral Neuropathy, University of Chicago, http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/evaluation/autonomic/qsart.shtml (last visited September 12, 2013).

esophageal stricture.  (R. at 454.)

Plaintiff returned to EDHC on February 23, 2009, complaining of heartburn.  (R. at 262.)
He also had "trouble swallowing" and a "burning" sensation in his throat.  (R. at 265.)  An upper
gastrointestinal endoscopy revealed an 8 millimeter ulcer and a hiatal hernia.  (R. at 262.)  His
stomach and small bowel were "normal."  (*Id.*)  Dr. Wilson noted his history of "esophageal rings"
and duodenal strictures, referred him for an esophagogastroduodenoscopy (EGD), and prescribed
him Nexium.  (R. at 262, 268.)  Don C. Rockey, M.D., the physician conducting the EGD, diagnosed
him with esophageal ulcer and hiatal hernia, and recommended that he follow up with his primary
care provider and repeat the procedure in eight weeks.  (R. at 280.)

On March 3, 2009, during a counseling session at TIMA NorthStar Clinic (NorthStar),
Plaintiff had a depressed mood, and was "tearful" and "easily disturbed by [his] situation."  (R. at
387.)  He told his clinician that he was "now wearing adult diapers for [his] fecal incontinence" and
would see his proctologist on May 15, 2009.  (*Id.*)  The next month, he told a counselor at Pastoral
Counseling and Education Center (PCEC) that he was "concerned about his physical well-being"
because, among other ailments, he experienced "rectal leakage" and had lost 10 pounds in the past
week.  (R. at 239.)

On April 3, 2009, Plaintiff presented to Dallas County Clinic (DCC), complaining of
incontinence of stool and gas that "occurr[ed] daily."  (R. at 517.)  He told the examining physician
that he did "not feel" his incontinence incidents when they were happening.  (*Id.*)  The physician
referred him for a colonscopy.  (*Id.*)  An HIV test was negative.  (*Id.*)

A few days later, Plaintiff underwent another EGD at Parkland.  (R. at 256–57.)  When
compared with the results from the February 23, 2009 EGD, the findings showed Plaintiff had "no
ulcers," but had a mild hiatal hernia in his esophagus, "mild gastritis", and mild duodenitis.  (R. at

259.)  Son T. Do, M.D., the physician conducting the procedure, recommended that Plaintiff follow

up with "pathology" if his "H. pylori test" showed he had a stomach infection, and that he continue

his high proton pump inhibitor (PPI) drug therapy[6] for his mild gastritis and duodenitis.  (R. at 282.)

In June 2009, Plaintiff underwent a colonoscopy with forceps at Parkland.  ( R. at 284.)  His

complaints were blood in his stool and fecal "incontinence."  (*Id.*)  Craig Howard Olson M.D.,

diagnosed condyloma,[7] transverse colon polyp, and rectal inflammation.  (R. at 285.) Dr. Olson also

"saw evidence of diverticula," mild gastritis, and mild duodenitis.  (*Id.*)  His "plan" was for Plaintiff

to "follow up in [the] proctology clinic for a discussion of [the] biopsy results and treatment of his

condyloma."  (*Id.*)  He also opined that Plaintiff should continue his PPI therapy to treat his gastritis

and duodenitis.  (R. at 514.)

Plaintiff saw Dr. Wilson again on July 6, 2009.  (R. at 459.)  This time he complained of a

rash on his right leg and difficulty eating and drinking caused by his inability to grasp objects with

his hands.  (R. at 459–60.)  He also had "esophagus problem[s]" and "[i]ncontinence of [the] stool."

(R. at 460.)  Dr. Wilson diagnosed him with benign essential tremors and leg pain, and prescribed

him medication for his rash.  (R. at 460–61.)  The next month, Plaintiff returned to EDHC,

complaining of toe fungus and of "stumbling all the time."  (R. at 469.)  Dr. Wilson opined that he

did "not have restless leg syndrome but rather small fiber neuropathy in his legs."  (R. at 470.)

On February 22, 2010, Plaintiff called the EDHC nurse line stating that he "ha[d] bruised

---

[6]  This is "the most commonly prescribed" therapy for "reducing stomach acid levels."  Harvard Public
Health, Harvard Medical School,
http://www.health.harvard.edu/newsletters/Harvard_Health_Letter/2011/April/proton-pump-inhibitors (last visited
September 12, 2013).

[7]  This is genital warts caused by the human papillomavirus (HPV).  *See* the U.S. National Library of
Medicine National Institute of Health, http://www.ncbi.nlm.nih.gov/pubmed/19820442 (last visited September 6,
2013).

ribs" and needed a prescription for a walker and a cane.  (R. at 357.)  During a follow up consultation three months later, Plaintiff reported sinus problems and difficulty swallowing. (R. at 479.)  Dr. Wilson noted his history of esophageal ulcer and stricture and Schatzki's ring.  (*Id.*)  He prescribed Plaintiff antibiotics for his sinuses and ordered X-rays of his upper gastrointestinal tract. (R. at 481.)

On May 12, 2010, James Wright, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's treatment records and concluded that his hypertension and benign essential tremors were not severe impairments.  (R. at 405.)  He referenced EDHC treatment notes from June and November 2008 showing Plaintiff's diagnosis of "small fiber sensory neuropathy," and notes from February 2010 showing that Plaintiff appeared well developed and nourished, his pulse was good, his feet were "normal," and he had no sensory deficit during a physical examination.  (*Id.*)  Dr. Wright indicated that his findings "complete[d] the medical portion of the disability determination." (*Id.*)

On June 24, 2010, Plaintiff underwent another upper endoscopy and an attempted balloon dilation of his Schatzki's ring.  (R. at 510.)  Andres I. Roig, M.D., noted that Plaintiff had undergone a balloon dilation of his Schatzki's ring in 2004 and did "relatively well" for about four years, but he had recently developed "symptoms of [acid] reflux and dysphagia [difficulty swallowing] again." (R. at 511.)  Treatment notes reflected that in early 2009, Plaintiff underwent an upper endoscopy, was diagnosed with an esophageal ulcer, and was placed on high dose PPI drug therapy.  (*Id.*)  Dr. Roig attempted, without success, to dilate Plaintiff's Schatzki's ring and concluded that it was "likely not causing [his] symptoms."  (*Id.*)  He recommended that Plaintiff follow up with the pathology clinic and continue his high-dose PPI drug therapy.  (*Id.*)

When Plaintiff saw Dr. Wilson on September 22, 2010, his complaints were chills,

congestion, sore throat, myalgias, shortness of breath, sore throat, and cough.  (R. at 538.)  Dr. Wilson diagnosed him with acute bronchitis, prescribed him antibiotics, and referred him to the neurology clinic to follow up with his "peripheral neuropathy."  (R. at 540–41.)  He also instructed him to "decrease smoking."  (R. at 542.)

During a consultation with Kag Ding, M.D., a Parkland neurologist, on November 11, 2010, Plaintiff explained that he felt "constant pain" in his feet and "nothing ma[de] the pain go away." (R. at 550, 552.)  Although his legs were also affected, the pain was most severe in his feet.  (R. at 552.)  He also stated that he did not want to take medication for his essential tremors because he preferred shaking rather than being drowsy from the medication.  (*Id.*)  During a neurological examination, Dr. Ding found that Plaintiff was alert, attentive, and well-oriented, and had normal speech and language.  (R. at 553.)  His facial sensation was intact to light touch bilaterally, he had no resting or posture tremors, had a mild action tremor, the sensation from his feet to his knees and from his fingers to his elbows was decreased, and he had decreased joint position and vibration sense in his toes.  (*Id.*)  Dr. Ding diagnosed him with essential tremors and painful small fiber neuropathy, recommended that he continue his current medications, and ordered a "skin biopsy."[8]  (R. at 553–54.)  She instructed him to "return in 6 months."  (R. at 555.)

On June 13, 2011, during Plaintiff's last visit with Dr. Wilson on file, he complained of having "horrible leg and foot pain" and "blisters in his mouth."  (R. at 584–85, 588.)  The pain was "now extending up his legs to about his knee," and the Gabapentin he took no longer gave him any relief.  (*Id.*)  He told Dr. Wilson that Dr. Ding recommended he undergo "vascular studies," and

---

[8] "A skin biopsy is helpful to distinguish certain disorders that might affect the small nerve fibers, as may be the case with painful sensory axonal neuropathies." Center for Peripheral Neuropathy, University of Chicago, http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/evaluation/nervebiopsy/index.shtml (last visited September 12, 2013).

"told him she could not do anything else for him." (*Id.*) Dr. Wilson continued his medications, ordered X-rays of his feet and other laboratory tests, and referred him to the podiatry clinic. (R. at 590.) A nurse's notes from June 15, 2011, reveal that Plaintiff was having difficulty obtaining X-rays of his feet due to his lack of transportation, but was given a bus pass that day. (R. at 605.)

### 3.      Hearing Testimony

On January 11, 2011, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 23–69.) Plaintiff was represented by an attorney. (R. at 25.)

#### a.      *Plaintiff's Testimony*

Plaintiff testified that he was 50 years old, single, lived alone, and had no children. (R. at 32–33.) He was right-handed, weighed about 150 pounds, and was six feet tall. (*Id.*) For the past three years, he had lived in an apartment subsidized by LifeNet, where he also received his mental health treatment. (R. at 31.) He assisted the property manager and obtained donations to help maintain the apartment complex. (R. at 33.)

Plaintiff graduated from high school but did not pursue higher education. (R. at 35.) In 1997, he worked at 1-800-Flowers as a floral designer. (R. at 36.) In 1998, he was hired by Clifton Carpets to sell carpets, but he did not complete the paid, three-month training program because "they decided that it wasn't [his] niche, and [he] agreed." (R. at 37.) Between 1998 and 2005, he worked at various florist shops, designing and selling home accessories and floral arrangements. (R. at 38–40.) In 2009, he obtained a job at Home Depot, where he trained to sell light fixtures and ceiling fans, but he was fired after his first week on the job because a comment he made was "misconstrued as [being] racist." (R. at 40.) After that, he applied for jobs at various florist shops without success. (R. at 41.) He received food stamps. (*Id.*)

Plaintiff had neuropathy in his feet, lower legs, hands, and arms.  (R. at 42.)  He sometimes experienced a tremor in his head, and he believed it was "hereditary" because his "grandmother's head shook."  (*Id.*)  He felt numbness in his hands, and his feet and lower legs "hurt all the time."  (R. at 44.)  Although he took Clonozepam and Gabapentin for his symptoms, these were not relieved completely.  (*Id.*)  Whenever he lay down, he felt as if his feet were asleep, and he got the sensation of having "pins and needles" if he stood up.  (R. at 45.)  Walking made his feet feel better.  (*Id.*)  His neurologist at Parkland recently ordered a diagnostic test relating to his neuropathy, but he could not remember the name of the procedure.[9]  (R. at 47.)

Plaintiff also experienced fecal incontinence, but the doctors did not know its cause.  (R. at 42.)  He underwent a colonoscopy, and doctors "removed a couple of suspicious polyps."  (R. at 43.)  In March 2009, he told a NorthStar clinician that he wore adult diapers due to his fecal incontinence.  (R. at 58.)  He experienced "minor leakage" and soiled his underwear "pretty much all the time."  (R. at 59.)  About twice a week, he "didn't make it" to the restroom.  (*Id.*)

On a typical day, Plaintiff's pain was at level 8 of 10.  (R. at 46.)  He did not know the heaviest weight he could lift and carry.  (R. at 47–48.)  His hands shook, and he lost his grip every time he picked up objects.  (R. at 48.)  He could not carry a gallon of milk across a room because his hands shook.  (R. at 48–49.)  He could walk for about a quarter of a block before needing to rest.  (R. at 50.)  He became fatigued and lost his "strength and endurance" if he tried to walk further than from his room to the common area of his apartment complex.  (R. at 56.)  Even if he could lean on something and shift his weight from foot to foot, he could stand for only a couple of minutes.  (R.

---

[9]  Pointing to treatment notes from November 11, 2010, counsel suggested that the test could be the "skin biopsy" that Dr. Ding recommended.  (R. at 67–68, 553–54.)  The ALJ responded that a skin test did not "make a lot of sense ... for a skin disorder, yes; but otherwise," she did not understand the purpose of a skin test in relation to Plaintiff's neuropathy.  (R. at 68.)

at 50.)  If he sat for more than a few minutes, he had to stretch and move around his legs to ease the pain.  (R. at 51.)  He lay down or reclined back for five or six hours a day.  (R. at 52.)

In response to a question by the ALJ, Plaintiff explained that when he told his clinician at LifeNet that he worked part-time for cash, he meant that he helped his friend sort out his mail, but "that was just a one-time thing."  (R. at 53.)  In return, his friend paid him $10 and bought him "a couple of items of food" from the store.  (R. at 54.)

Plaintiff could not perform his past relevant work as a flower designer because he would cut himself with knives, snips, scissors, or other sharp objects.  (R. at 59–60.)  That job also involved "a lot of exertion" that he could no longer endure, including moving and "picking up buckets … full of water [and] flowers, that weigh[ed] about 10 or 15 pounds."  (R. at 60.)

A year prior to the hearing, Plaintiff's psychiatrist prescribed him Valium for his anxiety and depression, but he stopped taking it because it made him extremely drowsy and "non-functional." (R. at 54–55.)  He did not experience any side effects from his current medications.  (R. at 55.)

### b.    *Vocational Expert Testimony*

The VE classified Plaintiff's past relevant work as a floral designer, floral arranger, or florist (light, skilled, SVP-6) and as a sales person of floral supplies (light, semi-skilled, SVP-4).  (R. at 61–62.)  Both jobs required frequent use of the hands.  (R. at 62.)  If Plaintiff were limited to sedentary work, based on his past relevant work, he would have no transferrable skills.  (*Id.*)

The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform work existing in significant numbers in the national economy if he had the following limitations: perform a full range of light work; frequent but not continual use of his hands; limited to simple, routine, and repetitive work; "low probability for error, and

therefore, [low] stress"; and "only incidental public contact." (R. at 63.) The VE opined that the hypothetical person could perform the jobs of cleaner/housekeeper (light, unskilled, SVP-2), with 12,400 jobs in Texas and 147,600 in the national economy; marker (light, unskilled, SVP-2), with 2,900 jobs in Texas and 37,200 in the national economy; and folding machine operator (light, unskilled, SVP-2), with 1,000 jobs in Texas and 14,900 in the national economy. (R. at 63–64.) When the ALJ added the option to stand or sit as needed to be comfortable, the VE opined that the person could perform the job of folding machine operator and could also perform the job of photocopy machine operator (light, unskilled, SVP-2), with 1,100 jobs in Texas and 16,200 in the national economy. (R. at 65.)

In response to a question by the ALJ, the VE explained that the "maximum tolerance" for absenteeism in these two jobs was 18 days per year, or one and a half days per month. (*Id.*) The ALJ asked the VE what tolerance, if any, these jobs had if the hypothetical person "for whatever reason," got off task or became unproductive, "or maybe even ha[d] to step away from the work site." (*Id.*) The VE replied that "on the low level", five minutes per hour "might be tolerated," and "at the maximum range," ten minutes per hour "might be tolerated," and this time provided for activities such as standing, stretching, and going to the bathroom. (R. at 65–66.) Anything more than ten minutes per hour would preclude the ability to perform the jobs. (R. at 66.)

In response to counsel's question, the VE testified that if the hypothetical person was limited to only occasional use of his hands for reaching, handling, fingering, and feeling, this limitation would "rule out" all of the jobs he identified. (*Id.*)

## C.    ALJ's Findings

The ALJ issued her decision denying benefits on February 24, 2011. (R. at 10–18.) At step

one, she found that Plaintiff had not engaged in substantial gainful activity since the date of his application.  (R. at 12.)  At step two, she found that Plaintiff had three severe impairments: bipolar disorder, small fiber neuropathy, and benign essential tremors.  (*Id.*) Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that satisfied the severity criteria of any impairment listed in the social security regulations.  (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform light work with the following limitations: frequently, but not continuously use his hands for fingering and handling; perform no more than simple, routine, and repetitive tasks; and have no more than incidental contact with the public.  (R. at 13.)  At step four, with the VE's testimony, the ALJ determined that Plaintiff could not perform any of his past relevant work.  (R. at 17.)  At step five, based on the VE's testimony, the ALJ determined that there were jobs existing "in significant numbers in the national economy" that Plaintiff could perform, including cleaner/housekeeper and marker.  (R. at 17–18.)  Accordingly, the ALJ determined that Plaintiff was not disabled, as the term is defined under the Social Security Act, at any time between his application date and the date of the ALJ's decision.  (R. at 18.)

## II. ANALYSIS

### A.    Legal Standards

#### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether there is substantial evidence to support the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled. If the individual is found to have severe impairment, then step three should be considered.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. If the individual does not meet listed impairment, step four should then be considered.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. If unable to perform such work, an RFC determination should be made and step five should be considered.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, and past work experience must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)–(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)–(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability in the relevant time period. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not

disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v.*

*Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**     **Issues for Review**

Plaintiff presents five issues for review:

(1)     Does the ALJ's failure to find that [Plaintiff] can maintain employment for a significant period of time violate the rule of *Singletary v. Bowen*?  In evaluating how bipolar disorder affects his ability to work, did the ALJ draw inferences of the sort that *Singletary* forbids?;

(2)     Is the absence from the RFC finding of any allowance for [Plaintiff] to take unscheduled breaks to change undergarments and clean up after a bowel accident supported by substantial evidence?  Did the ALJ bring sufficient medical expertise to bear in considering whether all of the following impairments in combination—TEF, esophageal atresia, Schatzki's ring, GERD, high-dose proton pump inhibition drug therapy, diverticulitis, inflamed rectal mucosa, and hemorrhoids—have any work-limiting effects? Did she offer a legally sufficient explanation of her analysis of these matters?;

(3)     In finding that [Plaintiff's] only upper-limb limitation is that he can "frequently, but not continuously, use his hands for fingering and handling," did the ALJ violate the rule against "playing doctor"? Did she violate the rule from *Ripley v. Chater* requiring that the specific respects in which a severe impairment is accommodated in the RFC finding must be supported by medical opinion on how the ailment impacts the ability to work? Is the upper-extremity limitation supported by substantial evidence, given all of the evidence that Plaintiff has finger numbness, grip difficulty, impaired fine dexterity, nearly illegible handwriting, and has limited ability to use sharp tools such as scissors?;

(4)     Does the ALJ's failure to "weigh" (or mention) the treating-source medical opinion of Dr. Estephen concluding that Plaintiff's small-fiber neuropathy and essential tremor cause him to have finger numbness and difficulty with fine dexterity justify remand? [and]

(5)     Is the post-hearing medical opinion of Dr. Kilcrease Fleming, Ph.D., which did not become available until after the Decision was issued, "new and material" evidence justifying reversal and remand under Sentence Six of Section 405(g)?

(Pl. Br. at 2–3.)

## C.      **Physical RFC Assessment**

Plaintiff argues that remand is required because the ALJ's physical RFC assessment is not

supported by substantial evidence.  (Pl. Br. at 13–24.)  He specifically contends that the ALJ "failed

to bring to bear medical expertise that was necessary to properly understand[] the limiting effects"

that his gastro-intestinal disorders,[10] either alone or in combination, had on his ability to work.  (*Id.*

at 13.)   Similarly, he maintains that the ALJ erred in failing to obtain a medical opinion regarding

the effects that his small fiber neuropathy and essential tremors had on his ability to work.[11]  (*Id.* at

21.)  He argues, in essence, that he suffered prejudice as a result of the ALJ's reliance "on her own

intuitive lay understanding" in assessing his physical RFC because the medical evidence showed

he had greater restrictions than those imposed by the ALJ.  (*Id.* at 13–24.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

---

[10]  Plaintiff first contends that the "ALJ's implicit finding that all of Plaintiff's gastro-intestinal disorders are 'not severe' is [] contrary to substantial evidence."  (Pl. Br. at 13.)  Whether or not Plaintiff's gastro-intestinal disorders were found to be severe impairments, the ALJ was still required to determine what effects, if any, these conditions had on his ability to work in determining his RFC.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996) ("While a 'not severe' impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").  Accordingly, this argument is adequately addressed in the context of Plaintiff's RFC issue.

[11]  Plaintiff also contends that the "ALJ violated the law by failing to weigh the treating-source medical opinion of Dr. Estephen concerning the nature and limiting effects of his upper-extremity impairments."  (Pl. Br. at 24.)  Dr. Estephen's disability letter from April 4, 2008, stated that Plaintiff's essential tremor "might limit some of his activit[ies] of daily living related to fine motor movements and dexterity" and that his small fiber neuropathy could cause swelling, chronic pain, and numbness.  (R. at 245.)  The ALJ was not required to consider Dr. Estephen's letter because it was dated more than 12 months prior to June 30, 2009, the date of Plaintiff's application for benefits.  *See* 20 C.F.R. §§ 404.1512(d), 416.912(d) (2012) (providing that the Commissioner generally considers the medical evidence covering the 12 months preceding the date of the claimant's application, "unless there is a reason to believe that development of an earlier period is necessary or unless [the claimant] say[s] that [his] disability began less than 12 months before [he] filed [his] application"); *see also  Johnson v. Astrue*, No. 3:12-CV-4175-BK, 2013 WL 3297594, at *2 n. 2 (N.D. Tex. July 1, 2013) (explaining that the ALJ was not required to consider medical records that predated the claimant's alleged disability period by more than 12 months).  Here, Plaintiff has not provided any reasons for the ALJ to consider evidence dating more than 12 months prior to his June 30, 2009 application date.  Regardless of whether the ALJ was required to consider Dr. Estephen's letter, because the ALJ did not rely on *any* medical opinion when assessing Plaintiff's physical RFC, Plaintiff's treating physician issue is essentially subsumed  in his RFC issue.

recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is

a "conspicuous absence of credible choices" or "no contrary medical evidence." *Johnson*, 864 F.2d at 343 (citations omitted).

### 1.    *Plaintiff's Alleged Gastro-Intestinal Impairments*

Plaintiff claims the ALJ's RFC assessment is flawed because she failed to consider the effects that his alleged gastro-intestinal impairments had on his ability to work, and as a result, she "fail[ed] to accommodate [for] Plaintiff's need to take unscheduled breaks in order to clean up and change [his] undergarments after bowel accidents."  (Pl. Br. at 13.)

When discussing Plaintiff's RFC, the ALJ first stated that she "must consider all of [Plaintiff's] impairments, including impairments that [were] not severe," as required by 20 C.F.R. §§ 416.920(e), 416.945, and SSR 96-8p. (R. at 12.)  She referenced Plaintiff's testimony that he was unable to work due to his small fiber neuropathy and essential tremors. (R. at 14, 42.)  She likewise acknowledged Plaintiff's testimony that he had fecal incontinence and "soil[ed] [him]self about twice a week and experience[d] minor leakage all day." (R. at 14, 42–43.)  She concluded, however, that Plaintiff was "not credible regarding his contention that ... fecal incontinence cause[d] limitations [that] prevent[ed] him from being able to work" because he "sought treatment for complaints of incontinence [and] gastrological problems ... on just a few occasions."  (R. at 14.)

In discussing the medical evidence, the ALJ noted Plaintiff's complaints to his physicians and counselors that he experienced, among other symptoms, "rectal bleeding" and "*occasional bouts of fecal incontinence*." (R. at 14) (emphasis added).  She pointed to Parkland treatment notes from April 8, 2009, showing that an EGD "revealed only mild gastritis and mild duodenitis and no evidence of an esophageal ulcer." (R. at 14, 256–59.)  She noted that a colonoscopy with forceps conducted on June 25, 2009, "yielded an impression of condyloma, transverse colon polyp, and

rectal inflammation." (R. at 14–15, 285.) She found important Plaintiff's apparent failure to seek medical treatment for his condyloma despite Dr. Olson's indication that he present to the proctology clinic for that purpose. (R. at 15, 285.) Her discussion shows she placed emphasis on Plaintiff's "minimal and conservative ... treatment" for his "gastrological problems." (R. at 16.)

Elsewhere in her opinion, the ALJ underscored Plaintiff's statements to his LifeNet clinician on November 16, 2010, that he worked part-time for a florist "who [paid] him cash to complete odd and end jobs" and that he enjoyed doing the work. (R. at 15, 578.) Lastly, she gave "some weight" to an opinion that she attributed to a SAMC (presumably Dr. Wright) that Plaintiff "retained the ability to perform ... physical requirements of basic work-related activities,"[12] and remarked that no treating or examining physician ever "opined that [Plaintiff] [was] disabled within the meaning of the Social Security Act." (R. at 16.) The ALJ therefore concluded that Plaintiff retained the physical RFC to perform light work, with the sole limitation that he could "frequently, but not continuously use his hands for fingering and handling." (R. at 13.)

The ALJ's narrative discussion shows that she acknowledged Plaintiff's mild gastritis and mild duodenitis, as well as his complaints of rectal bleeding and fecal incontinence. Yet, even assuming, *arguendo*, that she implicitly found these conditions to be non-severe impairments, the ALJ still failed to consider any medical opinion regarding what effects, if any, these conditions, together with Plaintiff's Schatzki's ring, GERD, tracheosophageal fistula, diverticulitis, and esophageal atresia and stenosis, had on his ability to work. (*See* R. at 10–18, 262, 268, 285, 454); *see also* 42 U.S.C.A. § 423 (d)(3) (West 2004) (providing that a "physical" or "mental" impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which

_____

[12] No such opinion by Dr. Wright (or any other SAMC) could be found in the record.

are demonstrable by medically acceptable clinical and laboratory diagnostic techniques"). There is no evidence in the record showing that a physician completed a physical RFC assessment or even opined about Plaintiff's ability to perform work-related functions despite his gastro-intestinal impairments. The Fifth Circuit has "held that an ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions," and "an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Williams v. Astrue*, 355 Fed. App'x 828, 832 n. 6 (5th Cir. 2009) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)); *see also Moreno v. Astrue*, No. 5:09-CV-123-BG, 2010 WL 3025525, at *3 (N.D. Tex. June 30, 2010), *rec. adopted*, 2010 WL 3025519 (N.D. Tex. Aug. 3, 2010) (explaining that without expert medical interpretation, "evidence describing the claimant's medical conditions is insufficient to support an RFC determination"). The ALJ therefore "impermissibly relied on [her] own medical opinions" to implicitly find that Plaintiff's gastro-intestinal impairments had no effects on his ability to work. *See Williams*, 355 Fed. App'x at 832.

Nevertheless, because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected," Plaintiff must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his physicial RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's failure to obtain a medical opinion in assessing the effects that his gastro-intestinal disorders had on his physical RFC casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the

disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The evidence before the ALJ showed that on December 15, 2006, Dr. Wilson diagnosed Plaintiff with GERD and ordered an upper endoscopy and colonoscopy.  (R. at 448, 451.) Subsequently, on March 3, 2009, Plaintiff told a NorthStar clinician that he was "wearing adult diapers for [his] fecal incontinence." (R. at 387.)  The next month, he told a PCEC counselor that he was "concerned" about his health because he had "rectal leakage" and had lost 10 pounds in the past week. (R. at 239.)  Shortly thereafter, he told a physician at DCC that he had incontinence of the stool on a "daily" basis and did not even notice when it was happening.  (R. at 517.)  On June 25, 2009, while performing a colonoscopy with forceps, Dr. Olson found "evidence" of diverticulitis. (R. at 285.)  The following month, Plaintiff told Dr. Wilson that he had "problems" with his esophagus and incontinence of the stool.  (R. at 460.)  By April 22, 2010, Plaintiff was having difficulty swallowing, and Dr. Wilson opined that this could be related to his Schatzki's ring and ordered X-rays of his upper gastrointestinal tract.  (R. at 479.)  Three months after that, Plaintiff continued to experience gastro-intestinal discomfort and underwent an upper endoscopy and an attempted balloon dilation of his Schatzki's ring.  (R. at 510–11.)  Plaintiff testified that he had incontinence incidents at least twice a week, and he experienced "minor leakage ... pretty much all the time." (R. at 59.)  His doctors did not know what caused his fecal incontinence.  (R. at 42.)

The Fifth Circuit has held that "incontinence may be an impairment for purposes of the Social Security Act and must be considered by the Commissioner in determining whether a claimant is disabled." *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir. 1999); *see also Reese v. Astrue*, No.

CIV.A 08-1423, 2010 WL 439528, at *4 (W.D. La. Feb. 4, 2010); *March v. Comm'r of Soc. Sec. Admin.*, 559 F. Supp. 2d 722, 731 (N.D. Tex. 2008).   While the ALJ acknowledged Plaintiff's testimony and statements to his physicians that he suffered from fecal incontinence, she rejected as "not credible" his contention that his incontinence "prevent[ed] him from being able to work," in part because of the limited, conservative treatment he apparently received.   (R. at 14.) Consequently, the ALJ did not incorporate any limitations into Plaintiff's RFC to accommodate for the need to clean up after an incontinence incident.   (*See* R. at 13.)   Notably, at the hearing, the ALJ asked the VE to state the "tolerance" for the hypothetical person to be off task "or maybe even ... step away from the work site" for the last two jobs that he identified.   (R. at 65.)   The VE opined that the longest the hypothetical person could take to stand, stretch, or go to the restroom was 10 minutes per hour, and anything above this threshold would preclude his ability to perform the jobs.   (R. at 65–66.)

Given the evidence supporting Plaintiff's complaints of fecal incontinence (despite his allegedly conservative treatment), the ALJ could have reached a different disability determination had she obtained expert medical opinion regarding the effects that this condition had on Plaintiff's ability to work and incorporated relevant limitations into his RFC.   *See, e.g.*, *Flynn v. Comm'r of Soc. Sec.*, No. 1:11 CV 759, 2012 WL 2190905, at *7 (N.D. Ohio June 14, 2012) (explaining that just because the plaintiff's underlying condition, which caused fecal incontinence, "was deemed to not warrant surgical repair [did] not mean it [was] asymptomatic or ha[d] no impact on [the] Plaintiff's RFC"); *Mac v. Sullivan*, 811 F. Supp. 194, 199 (E.D. Pa. 1993) (explaining "that [a] necessity to leave the work station regularly due to incontinence could significantly affect a claimant's ability to meet job demands, even for a claimant of unimpaired physical strength, and

thus reduce the number of jobs available to that claimant") (citation omitted).

Accordingly, the ALJ's failure to consult medical opinion evidence regarding the effects of Plaintiff's fecal incontinence, along with his other gastro-intestinal impairments, when assessing his RFC prejudiced his claim, and remand is required on this basis.

### 2. *Plaintiff's Neurological Impairments*

Plaintiff also complains that the ALJ's finding that he could "frequently, but not continuously" use his hands for fingering and handling, despite his small-fiber neuropathy and essential tremors, is not supported by substantial evidence because it is not based on expert medical opinion but rather on the ALJ's "own lay intuition." (Pl. Br. at 21.)

As discussed, the ALJ impermissibly relied on her "own medical opinions" to determine the effects that Plaintiff's physical impairments had on his ability to work. To warrant remand, however, Plaintiff must show that the ALJ's error prejudiced his claim with respect to his essential tremors and small fiber neuropathy. *See Morris*, 864 F.2d at 335; *McNair*, 537 F. Supp. 2d at 837.

The ALJ implicitly accepted Plaintiff's diagnoses of essential tremors and painful small fiber neuropathy. (*See* R. at 15.) She rejected his allegations that he could not work due to these impairments as "not substantiated by the evidence of record," based in large part, on her conclusion that Plaintiff sought treatment for these conditions "on just a few occasions." (R. at 14–15.) The ALJ pointed to the results from UT Southwestern's nerve motor conduct test taken on June 29, 2008, that Plaintiff's peripheral small fiber function "was intact" and his cardiovascular system was normal. (R. at 15, 235.) She also referenced Dr. Ding's notation on November 11, 2010, that Plaintiff had not presented for treatment "since January 26, 2010." (R. at 15, 550–52.) She accepted Dr. Ding's findings that there "was no evidence of resting/posture tremor and only mild action

- 25 -

tremors," Plaintiff had "decreased sensory pulse pressure up the knee and elbow bilaterally [and] decreased vibration in the toes, and the Romberg examination was negative." (R. at 15, 553.) The ALJ found important Plaintiff's statements to a LifeNet clinician on November 16, 2010, that he was working part-time, was receiving cash for his work, and enjoyed the job. (R. at 15, 578.) She concluded that Plaintiff's activities, including his "voluntary work collecting donations for his apartment" complex and working part time for a florist, were "certainly not the activities of a person who [was] totally disabled." (R. at 16.)

In December 2006, Plaintiff complained to Dr. Wilson that he experienced paresthesias in his feet, which worsened at night, and that his feet stayed "numb a lot of the time." (R. at 495.) He returned on January 2 and May 2, 2007, complaining of similar symptoms, and was diagnosed with restless leg syndrome. (R. at 246–48, 492.) He reported the same symptoms on June 17, July 23, and August 11, 2008. (R. at 272–73, 423, 429.) On June 17, 2008, he told Dr. Estephen that he was diagnosed with essential tremors in his hands at a young age. (R. at 273.) In November 2008, he saw Dr. Wilson because he felt pain and a burning sensation in his feet and lower shins. (R. at 266–70.) By July 6, 2009, he was having difficulty eating, drinking, and gasping objects due to the essential tremor in his hands. (R. at 459–60.) By the following month, he was "stumbling all the time," and Dr. Wilson opined that he had small fiber neuropathy in his legs, rather than restless leg syndrome. (R. at 470.) Plaintiff told Dr. Ding on November 11, 2010, that his pain was most severe in his feet. (R. at 552.) He did not want to take medication for his essential tremors in his hands because he preferred being "shaky" from the tremors than being drowsy from the medication. (*Id.*) During the last consultation on file on June 13, 2011, he told Dr. Wilson that he had "horrible" leg and foot pain. (R. at 588.)

Aside from his statement to Dr. Wilson that he had trouble eating, drinking, and gasping objects with his hands, the evidence showed that his neurological impairments affected primarily his lower extremities.   Accordingly, as the fact-finder, the ALJ had the sole responsibility for deciding whether or not Plaintiff's allegation that he could not work due to his essential tremors and his "inability to feel anything with his hands and fingers" was supported by the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir.1991) (per curiam); *see also Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] ... to resolve.").  Given the limited evidence regarding the impact that Plaintiff's essential tremors and small-fiber neuropathy may have had on his ability to use his hands, he has failed to show that the ALJ would have reached a different RFC finding, and therefore a different disability determination, if she had consulted medical opinion evidence[13] regarding the effects of these impairments on his ability perform work-related functions. Accordingly, substantial evidence supports the ALJ's RFC assessment in relation to Plaintiff's neurological impairments.

Nonetheless, because the ALJ's failure to rely on medical opinion evidence when determining Plaintiff's physical RFC prejudiced his claim in relation to his gastro-intestinal impairments, remand is required.[14]

### III.    CONCLUSION

Plaintiff's motion is **GRANTED in part,** Defendant's motion is **DENIED in part,** and the case is **REMANDED** to the Commissioner for further proceedings.

---

[13]   As noted, the ALJ was not required to consider Dr. Estephen's disability letter.  In addition, Dr. Estephen opined about the effects of Plaintiff's neurological impairments on this ability to engage in daily activities, but he did not translate those effects into Plaintiff's ability to perform work-related functions.  (*See* R. at 245.)

[14]   Because the ALJ's proper determination of Plaintiff's RFC on remand will likely affect Plaintiff's remaining issues, these are not addressed.

**SO ORDERED** this 12th day of September, 2013.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE